Herman Lambert, Albert Allison and Henry McCoy were indicted for breaking and entering the dwelling-house of Mose Owl, and stealing certain personal property therefrom. There were also counts in the bill of indictment for larceny and receiving stolen goods knowing they had been stolen. They pleaded not guilty, and all three were convicted of breaking and entering otherwise than by burglarious breaking, and duly sentenced. The defendant Henry McCoy did not appeal.
Mose Owl testified: "The goods were stolen on Thursday evening, 31 May, 1928, and found on the following Monday morning, between 1 and 2 o'clock. He and his family left home about 6 o'clock Thursday evening to attend an entertainment and returned home that evening about 11 o'clock. There was missing from the house a 25-20 Winchester high-power gun, a box of shells, a sack of `Town-Cryer' flour, 50 pounds of sugar, in two 25-pound sacks, a dollar's worth of meat, a pair of scissors, some slippers and a shawl. The property was worth about $50. Henry McCoy, the day before the house was broken into, about 1 o'clock, stopped at Mose Owl's house for about ten minutes and asked him if he was going to the entertainment. Mose Owl identified the gun; it was marked on the barrel. The other property,`All I say is that they are like mine.'"
Arnold Cooper testified: "That he was with the officer (Sutton) when they went to defendant's, Herman Lambert's, house. They found 50 pounds of sugar, 25-pound sack of `Town-Cryer' flour; it had not been opened. It was found in the bed covered up, that defendant Herman Lambert said he had gotten out. The shawl was found about two weeks later. The cartridges were in defendant Albert Allison's pocket. The three defendants were all in Herman Lambert's house, a little cabin of one room. All three of the defendants were seen together on Sunday. In the house was found also a pair of pants and belt that belonged to witness. At the preliminary hearing Tom Lambert, the father of Herman Lambert, told the court that Henry McCoy, the defendant, had *Page 526 
something he wanted to say, and they told him to go ahead, and he said he wanted to say he would take all the blame on himself, and that the other boys did not have anything to do with it. He found the scissors and slippers in a duck sack coat defendant Herman Lambert said was his. Found the shawl about two weeks afterwards near Tom Lambert's place. With the shawl he found a coat, a couple of shirts and a pair of shoes that had been taken from him. Herman Lambert stated none of the stuff belonged to him. He also said that Albert Allison had been wearing the coat."
Mrs. Mose Owl testified: "I am the wife of Mose Owl. I know that shawl; it is mine. We missed it the night the other stuff was taken from our house."
A. J. Sutton, a deputy sheriff, was with Arnold Cooper in the searching party. They knocked, and it was about thirty minutes before they were let in. "There were two beds in the house and they were pretty close together, and this one (Herman) Lambert was sleeping in looked like some one else was in it. He said that was where he slept, and that nobody else was in the bed. The table was up against it and the boys kept looking and searching and come to the bed and throwed the cover back and pulled out two twenty-five pounds of sugar, and a sack of flour and a piece of meat and some pants and one stuff and another was wound up in the cover, and I asked him if that was his, and he said it wasn't; he didn't know anything about it. We went ahead and got that and hunted all around everywhere in the house. That gun was under the bed where the other boys were sleeping. I never saw them pull that out. There was a flashlight lying on the table, and I said, `Whose is this?' and nobody owned it. (Herman) Lambert said it wasn't his, and then the scissors and slippers, nobody claimed them."
Tom Lambert was defendant Herman Lambert's father. When near his house, defendant Henry McCoy tried to escape, also defendant Albert Allison. Herman Lambert, after the stuff was found, said it wasn't his stuff and he knew nothing about it. The witness further testified: "The stuff was bound to have been put in after he got out of bed. It was rolled up in the cover, and the sacks were wet, and it had been put in the house that night. I don't remember in whose pocket I found the shells. Mr. Cooper and Mr. Sherrill (the other members of the searching party) pulled the gun out from the bed where McCoy and Allison were sleeping. The sacks were kinder wet. It had been brought in there that evening. It had been raining that evening and my idea is that some time late that evening or that night they brought it."
Herman Lambert and the other defendants testified in their own behalf. Herman Lambert set up an alibi and denied breaking into Mose *Page 527 
Owl's house. He contended that Henry McCoy brought the stuff to his house. "He said, `If you are going home I have some stuff I want to take up there. I am going out to the mountains, and I have a sack of flour and some meat. I will put it in for board while I am at your house.' . . . I waked up; there was somebody hollering in the yard, and I called and asked them what they wanted and they told me; and I put on my clothes and told them to come back to the other door and come in, and while I was putting on my clothes Henry (McCoy) jumped up. I never noticed what he was doing; and they come in and found this stuff in my bed, and I knew nothing about it. I knew it was in the room, but not in the bed. I never put it in the bed. He said he was going towards Cooper's Creek Bald. He said he was going to put up and make some liquor out there; said he wanted to get some money to leave here on. I didn't know that it was stolen stuff. . . . That evening Henry McCoy left me at the forks of the road and went home, and Albert Allison went home with him and ate supper at their house, and I ate supper at my daddy's and got the key for the house. I first saw this stuff when he had it about a quarter of a mile from Morgan Bradley's house sitting by the side of the road where a pine tree had been cut. I first found out where it was that night; that was Sunday night after it was stolen. My wife wasn't at home; she was at her mother's. She was there on the night of the 31st. I don't know who put those scissors in that coat pocket. I hadn't had that coat on since Friday. Allison had been wearing the coat."
Albert Allison testified that he was 23 years old. He set up an alibi and denied breaking into Mose Owl's house. "Henry McCoy said he had some stuff; that he was going to the mountains next week. At that time I had heard that Arnold Cooper's house was broken into. That night he said he had some stuff — some flour and meat — to put in on his board while he stayed at Herman Lambert's. We got the stuff, and we went down the road. Henry gave me some Winchester cartridges, and I carried the Winchester and something in a sack, and we set it by the door. All the stuff was in sacks. There was three or four sacks. Me, Herman and Henry carried one. The stuff was hid a little piece from Morgan Bradley's under some pine brush in the woods. It wasn't but a little piece off the road. We got to Herman Lambert's house about ten o'clock. Henry said he was going to make liquor with this stuff. He said he was going toward Cooper's Creek Bald. When we went to the house we set the stuff down next to the door and got in bed. Henry and me got in the bed together, and Herman Lambert got in the other bed, and when I waked up Henry waked me getting out of the bed, and he grabbed the stuff and rolled it up in the bed. I saw him do that; that was while Herman was putting on his clothes; then he came back and *Page 528 
got the Winchester; it was sitting by the door, and put it under the bed. He didn't try to leave, but he come back and got back in the bed with me after he put the Winchester under the bed. When I got up I told the officers that I didn't have anything to do with it. Herman Lambert said the stuff didn't belong to him, and that he didn't know anything about it. In regard to where they found the scissors I heard him tell them that he hadn't been wearing that coat. I had been wearing the coat for a day or so. At the time I helped carry the stuff I didn't know it had been stolen. When Henry told me he had the stuff hid he said he was going to the mountains to make liquor — to make a run of beer. After I found that it was stolen I never touched it. . . . I didn't know it was stolen goods when I saw Henry putting it over in the bed. It looked suspicious. When they knocked on the door Henry McCoy hopped out of bed and took the stuff and put it in the other bed. I saw him do that. I didn't do anything. Henry gave me the cartridges in the presence of Lambert on Sunday morning. I found the gun on Saturday night, and he gave me the cartridges on Sunday evening, I think. He didn't say anything, only he wanted me to carry the cartridges, and I kept them in my pocket. I told Mr. Cooper about them and gave them to him as we come down the road . . . . This stuff we found about a mile and a half of Mose Owl's house. I heard there had been some property stolen at Arnold Cooper's, but not at Mose Owl's. That was the report in the community. I knew that, and never asked Henry where he got his stuff; it wasn't any of my business. We slept in the barn that night because it was warm, and we didn't want to wake up Tom Lambert. I hadn't been into anything that night. We didn't want to wake up Uncle Tom and sleep in a bed. That was Saturday night. That was the night I got hold of the gun."
Ed Welch testified: "I knew where Mose Owl lives. I saw Henry McCoy right above Mose Owl's about 7 o'clock on the evening of the 31st. I didn't see anybody else there. I just saw him; he was coming towards Mose Owl's by himself. (Cross-examination): I saw Henry on Thursday night, I met Henry about twelve o'clock that night above Mose Owl's on the road."
Henry McCoy set up an alibi. He testified: "On Sunday morning I went down the highway and was fooling around and got in with Herman Lambert and Albert Allison, and fooled around until about 12 o'clock, and then Albert stayed with me till after supper, and Herman come and said he wanted us to go home with him, that his wife was gone, and he got us to go with him, and we went on down the road, and he had some stuff that he said he wanted to take up. We found this stuff, and I didn't know what it was, but he had the gun. I saw the gun. The stuff was on a ridge over from Tom Lambert's. We took the stuff and went *Page 529 
on up to Herman's house, and it got to raining before we got there, and there was a little shed, and we stopped there out of the rain, and I went to sleep, and when I waked up it was something like 12 o'clock, and we hadn't been in bed long, but had gone to sleep when the officers come, and when I waked up Herman was up, but there wasn't any light. I could hear him walking around, and I heard the officers at the door hollering, and he lit the light, and said must he let them in, and I told them to let them in, and he opened the door and let them come in. I didn't know where the stuff come from, and it was in sacks, but I had heard that Mose Owl had lost a gun, and I had an idea that this was his gun. I carried a sack of flour. When they found this stuff in the house I didn't get up out of bed. I don't know how long it was from the time the officers got there until they come in the house. I didn't wake up when they first come. It was about five minutes after I woke up before he lit the lamp. I don't know who put the stuff in the bed; it was there when the lamp was lit. It was the same stuff I helped carry up there. I carried a sack of flour. The last time I saw the stuff it was sitting over against the door. The next time I saw it the officers took it out of the bed, and Herman was up in the house. None of that stuff was mine — not a thing. Q. Did you have any idea these boys had stolen these goods at that time? A. I didn't know who put it there. . . . About the statement I made: I was sitting around there. Mr. Martin had turned us out in the run-around, and I was sitting looking out the window, and Herman Lambert and Allison came around there and Herman had a window weight in his hand, and he asked me what I was going to swear, and I said I didn't know anything to swear, and I was just going to tell the truth, and he said, `If you don't own this and tell that me and Albert didn't have anything to do with it, I will kill you when you get out.'. . . I have been indicted for stealing a time or two. I was indicted for breaking into Lambert's store. I was indicted in one liquor case and worked on the road for it. I made some liquor that time. I wasn't going to make it out of this sugar. I didn't have any sugar. . . . I submitted to making the liquor. I have been indicted two or three times for stilling and house-breaking." He denied what his codefendants testified to against him.
Gomer Martin testified: "I am the jailer. I heard Tom Lambert make a statement in jail. He told them to keep their mouths shut and not to talk; if they knew anything not to tell it. Henry McCoy complained to me about being afraid of these other two boys. He said they had threatened to kill him if he didn't take this on himself. That is what he told me shortly after the hearing. I don't know that he said anything about being afraid to go to sleep, but they had a window weight *Page 530 
in there somehow, and I got it out. . . . The general reputation of Albert Allison is bad, and Herman Lambert and Henry McCoy the same."
All who are present, either actually or constructively, at the place of the crime, and are either aiding, abetting, assisting or advising its commission or are present for such purpose, are principals in the crime. S.v. Gaston, 73 N.C. 93; S. v. Jarrell, 141 N.C. 722; S. v. Cloninger,149 N.C. 567; S. v. Baldwin, 193 N.C. 566.
In S. v. Ford, 175 N.C. at p. 800, the law is stated: "The doctrine of recent possession, as applied in the trial of indictments for larceny, frequently leads to the detection of a thief, when without it the guilty would go free, but the temptation to shift evidence of guilt from one to another, and the ease with which stolen property may be left on the premises of an innocent person, make it imperative that the doctrine be kept within proper limits, and as Lord Hale says, 2 Pleas of the Crown, 289, `It must be warily pressed.' . . . The presumption, when it exists, is one of fact, not of law, and is stronger or weaker as the possession is more or less recent and as the other evidence tends to show it to be exclusive. S. v. Rights, 82 N.C. 675; S. v. Record, 151 N.C. 697."
In S. v. Hullen, 133 N.C. 656-660, speaking to the subject: "If recent possession of the stolen goods is evidence that defendant committed the larceny it must also of necessity be evidence of the fact that the defendant broke and entered the house, because, it is evident that the larceny was committed in the house by the person who broke and entered it, and there is no evidence that it was committed in any other way. S. v.Graves, supra (72 N.C. 482)." S. v. Williams, 187 N.C. 492; S. v.White, ante, 1.
In 9 C. J., p. 1082, it is said: "Proof of possession of defendant, shortly after the burglary, of goods stolen at the time of the burglary, is to be considered by the jury, and if unexplained, and if breaking and entry by some one is shown, will be sufficient, when accompanied by other circumstances tending to connect him with the commission of the offense, to warrant conviction, although the other evidence might not alone be sufficient. In the note below reference is made to cases in which the evidence of possession of stolen property, together with other circumstances, was held sufficient to sustain a conviction." A case in the U.S. Court and cases in twenty-one states of the Union are cited in support of the above principle. S. v. Hullen, supra, is cited. *Page 531 
We have examined the evidence with care and the charge of the court below. The evidence as to the breaking and entering on the part of the defendants is circumstantial. The goods were stolen Thursday evening, and some three days afterwards were found in the possession of defendants according to the officers, about 1 or 2 o'clock Monday morning. The defendants lived in the vicinity of the house that had been burglarized. The stolen goods, perhaps, could not be carried easily by one person. Before being taken to Lambert's house, they had been lying out — the sacks were wet. The property of another that was stolen in the vicinity was found in the house where the goods in controversy were found, all defendants being present. When the goods were found, conflicting statements were made by the defendants. The general reputation of defendants was bad. All these and other circumstances, we think, sufficient evidence to be submitted to the jury for them to pass on as to a joint enterprise of all the defendants in the burglary. The probative force was for the jury to determine.
Taking the charge as a whole, we think the court below charged the law correctly in regard to circumstantial evidence. The rule of reasonable doubt was frequently applied, and on the whole evidence the charge on recent possession of stolen goods as evidence of breaking and entering, we cannot hold as reversible error. We cannot say the charge of the court impinged on C.S., 564.
We have carefully read the record and briefs, and we find no reversible error.
No error.